May it please the Court, for over 40 years since the Supreme Court's opinion in worldwide Volkswagen, this circuit has consistently and repeatedly applied a stream of commerce test for jurisdiction in products liability cases. When the Supreme Court next considered the issue in the Asahi case, it did not produce a majority opinion, as this Court is well aware, and instead a fractured two-plurality opinion from Justice O'Connor and Justice Brennan. Again, this circuit consistently and repeatedly, as recently as last December in the DePue orthopedics case, has found that in this circuit, you apply the Justice Brennan stream of commerce test that is more broadly interpreted. If you apply that test to this case, the trial court found that the seat involved entered the stream of commerce or an exit in the state of Texas. That ruling was not objected to or appealed by the appellee. There's no question that it caused injury in the state of Texas. That's where the incident occurred. Again, no objection to that finding. The issue here is whether or not we were required in the trial court to present evidence that the defendant deliberately targeted the state of Texas. If you read the district court's opinion, he notes that we failed to produce evidence that they engaged in activity directed at Texas. That is not what is required. What is required is that we needed to produce evidence that it was foreseeable to them that the subject driver's seat would be used by consumers in the state of Texas. We presented ample evidence of that. If you look at this court's ruling in the Ainsworth case, the most recent case directly analyzing a similar issue, the court found in that case that a forklift in the state of Mississippi, that it was foreseeable given the volume of sales of those forklifts in the state and the heavy influence of the poultry industry. Here, Texas is the second largest state in terms of registered drivers and vehicles on the road. We know through the documents that were obtained in discovery and are in the record that the defendants targeted the bid to supply seats specifically for the United States. The seats involved were coded on a label so that at the assembly process in Europe, the U.S. bound seats would be installed in U.S. bound vehicles. Does it matter how, whether the defendant knows how many? Because I think the problem in the brief is that we're talking about seats that are destined, you just said, destined for the United States. And so they could go anywhere, let's say within the contiguous 48 states and maybe even the U.S. law. Does it matter that the defendant know how many or at least anticipate how many are going to go to Texas in particular? I think it does matter, Your Honor, because if you look at the Supreme Court's opinion in McIntyre, there the court found that one sale in the state of New Jersey was not enough. But the court observed that if it was a large manufacturer and reflected back on worldwide Volkswagen, if it was Audi or Volkswagen that had challenged jurisdiction in that case, that the quantity matters. Justice Stevens noted that as well in McIntyre. Here the record shows that 28,000 of these seats were sold in the United States in 2008 alone. And that the contract that the defendants bid and got the opportunity to supply seats involved over 139,000 anticipated sales. So when they are told in the agreement, and it's in the record at page 67-68, that these vehicles are intended to be marketed for short and long distance driving in the United States, they might be available for rental car use, they know that they're supplying 139,000 seats that will be driven in just that fashion. And I don't think this court is required to ignore the prominence of Texas in the automotive marketplace. If you look at the comments made by the court in McIntyre, the relevant commercial circumstances of the product are a valid consideration for the court. Does the product leave the stream of commerce if in this case it's purchased by an individual for private ownership, presumably the person drove around in the vehicle for years and then ultimately sold it again? Does it become out of the stream of commerce once it's purchased privately? I think it does, Your Honor, but the importance in this case is that stream flowed into and ended in the state of Texas, which is where, of course, this case is held. Where it wound up. Okay. We're talking about seats that were assembled in Germany? France, Your Honor. Assembled in France? Well, assembled into the vehicle in France. The seat itself was built in Germany. Okay. Well, I said assembled in Germany. You're saying built in Germany? Yes, Your Honor. Built or assembled in Germany. They made them, the seats, in Germany? Yes, Your Honor. And then they shipped them to France? With a coded label indicating they should be installed in vehicles bound for the United States because they were equipped with a side impact airbag fixture. You're saying they put the coded label on there in Germany? Yes, Your Honor. Yes, Your Honor. And that's in the record at page 7418 and at 6774. And so that when it came time in the plant in France to pull a seat, they scanned the barcode. This is a U.S. bound seat because it's equipped with the necessary equipment needed for the United States market. And it would go into a U.S. bound vehicle. And the appellee was well aware of that. Built them for that purpose. Labeled them for that purpose. And shipped them knowing that when that barcode was scanned, they would be going to the United States. So are you arguing that that, by that action alone, the defendant should be amenable to a lawsuit in any of the states in the United States? Well, Your Honor, there's a governor on that in this case. There were only 35 states that sold this vehicle. So if one of the requirements, which it has always been in this circuit, is that it exit the stream of commerce, that acts as a governor here. That would only occur where they were sold to a retail consumer. But otherwise, yes. Because you have to look at what benefit did they derive from the markets that they targeted? And is it fair then to ask them to bear the burden of facing a lawsuit there? In this particular case, because of the automotive context, this defendant in the supplier agreement may, took on the obligation of assuring that the vehicle would perform appropriate, or excuse me, the seats would perform appropriately in a crash. That they would comply with the U.S. regulations. And I think it's very important that the court consider, again, as the Supreme Court has instructed, the economic realities of the market. Here, by this appellee taking on the burden of assuring compliance with U.S. safety regulations, the Federal Motor Vehicle Safety Act makes this appellee, as a supplier of motor vehicle equipment, liable to face a judicial action in any federal district court. If they fail to notify our government of a defect in the seat, for example. Or if they have some other recall action. So if you back off to the fundamental question in any 14th Amendment due process case, does it comport with substantial justice and fair play? You had the commercial supplier here, of a large volume of driver's seats, who chose to accept the responsibility of compliance with U.S. safety regulations, which they knew would subject them to potential judicial action in any federal district court in the United States. Counsel, I have maybe a point and then a question. It seems like the case law, Ainsworth among them, is saying that it's not enough that it's put into a stream of commerce that manufacturer knows reasonably anticipate it will go to the United States. That doesn't automatically make the person subject to suit in any of the 50 states. So you need, as Ainsworth got into, some evidence more than just the knowledge that it could come any place, that the vehicle could be sold in any state. You said there's only 35 states, but that seems to me sort of a special case for you. It would apply, I think that same argument would apply to any of the 35 states. The question has to do with this entry and exit from stream of commerce. It seems to me when it was sold to, I think, somebody from Louisiana and held for six years, if I remember the facts, and then traded in and sold again back in Texas, it didn't have to be sold again back in Texas. It could have been sold again in Mississippi or New York State or something else. It seems to me that it was sold again back in Texas is a fortuity, is something unrelated to anything the manufacturer did. And that's part of what the case law talks about as well. There's no connection, it seems to me, in this second sale and the reentry, if that's what it was, into the stream of commerce, and what the manufacturer's initial knowledge and reasonable expectations may have been, if that's even the way to look at it. To the extent that made some sense, can you respond to that? I understand the Court's question, and it is true. I wouldn't argue otherwise, that it was fortuitous that the gentleman who owned it in Louisiana traded it in in Plano, Texas. Let me ask about a premise for that. Is your argument basically that since Texas is such a large market, that that makes it fit with Ainsworth, but that applies to the initial sale of this car in Texas? That is part of our argument, Your Honor, because the question is— Okay, so at least for that, you then have jurisdiction in Texas, a specific jurisdiction in Texas that something happened to that car at that time. So I'm talking about a break in that, an exit from the stream of commerce, a reentry that seems fortuitous that it was in Texas and not in someplace else. Well, that may very well be, but that's not the issue for the analysis. Is it now fair and comport with due process to have the appellee face— That's the tail end of it. I'm still talking about stream of commerce doctrine, not the very end of it of whether it's fair that it works out that way, and it doesn't seem to me that it fits cleanly with what Ainsworth and the cases from the Supreme Court that it's trying to analyze, but controllably for us, it has analyzed how we're supposed to do this. What I can say to the— What's your best case on a situation like this? Well, I think if you look at the bean dredging case— The what? The bean dredging case, Your Honor, there is no evidence in the record that the dredging equipment never left the boundaries of the state of Louisiana after it was shipped here. The question is, once there's a legal action pending, is the forum, in that case Louisiana, is it fair and comport with due process to hold the appellee or the party in that case to face jurisdiction there? And it's the same question here. They knowingly targeted a distribution channel that they knew would go to the United States and certainly knew that Texas was a very large market for the automotive context. But I would say, and what I said a moment ago in response to Justice Englehart's questions, that in this context, because they were taking on the burden of complying with U.S. safety regulations and chose to supply a piece of motor vehicle equipment with all the accompanying regulatory requirements, that also alone would make it comport with due process that they face legal jurisdiction and the seat happens to have a failure, an alleged defect. You don't think that it's required, a showing is required that MAGNA itself knew where the sales were to occur, what, whatever, the two or three dealerships in the state of Texas, they didn't need to know what sort of dollar volume the manufacturer or the shipper was earning based on sales in the United States. None of that really matters except for the fact that they made the seats compliant with U.S. law. No, Your Honor. Certainly it does matter the volume of seats which they supplied that they knew were going to the United States. That speaks to the markets that they were targeting. Because if you look at the case law, it refers to both direct and indirect targeting. And if they only supplied 20 seats in the United States, that would be quantifiably different than 140,000. So I'm not taking the position that U.S. regulatory compliance alone should be the linchpin in this case. But it is a major factor because of the economic realities of the product. The one thing we can all learn from the McIntyre opinion is that it is the context of the product that matters. And that is the context here. I will say that the Appley's argument that this court should defer to the Texas Supreme Court's interpretation of the Due Process Clause has been resoundingly rejected by the district courts in this circuit, and I think appropriately so. The Texas Supreme Court noted in Spur Star did not change their law that the long-arm statute continues to reach the bounds of the Due Process Clause. And when it comes to that, where is the outer limit of the Due Process Clause? This court need not defer to any state's Supreme Court and should only look to the U.S. Supreme Court and its own prior precedents. I'll yield back the balance of my time. May it please the Court. There's really about three issues that need to be addressed, and the first one is the most important. And that's did the lower court, did they correctly conclude that based upon the extremely thin facts in this record, it could not properly exercise specific jurisdiction over Magna Germany, even under this circuit's stream-of-commerce test? The second issue is, assuming this court agreed with Zock and concludes that those thin facts were enough to satisfy that stream-of-commerce test, was that the right test to apply under these facts and circumstances when, in Texas, the long-arm statute has been defined as doing business consistent with the stream-of-commerce plus test? And lastly, the last issue, of course, would the exercise of personal jurisdiction over Magna Germany be fair and reasonable under these facts? Consistently, since about 2011, if we look at personal jurisdiction, so 2011 is kind of the watershed moment. We get the decision in Daimler versus Baumann. We learn about general jurisdiction and how that's different. And then we also start learning more about specific jurisdiction and that being case-linked jurisdiction. And so the terminology that's used in specific jurisdiction, which is what's at issue in this case, is very consistent. It's the inquiries, the relationship between the defendant, the forum, and the litigation. It's a forum-by-forum analysis. It's highly fact-specific. It does not travel with the product. And the court will look at the suit-related conduct and see whether it creates a substantial connection with the forum state. This is from the Walden opinion. Look at the relationship among the defendant, the forum, and the litigation. The relationship must arise out of the contacts the defendant, he himself, creates with the forum state and not someone else. So that's the test, and here are the facts. So the district court said, on this record, there is no evidence that Magna Seeding of Germany knew or would suggest that it was foreseeable to Magna Seeding that the Smart for T vehicles would enter the stream of commerce in Texas. No objective or subjective evidence that Magna Seeding's knowledge of the Texas market would satisfy this circuit's stream of commerce test. So what was that proof? Well, the proof from Magna was as follows, from Magna Germany. Magna Germany is a company in Germany. They're located in Germany. They have no contacts with Texas. They don't design things in Texas, market things in Texas, advertise in Texas. No registered agent in Texas. Not licensed to do business in Texas. No one travels to Texas. Magna Germany is a seat manufacturer in Germany, and this particular seat that ended up in a Smart for T Daimler car was manufactured in Germany. Now, the way this one came together was as follows, because none of this is simple. So in Germany, Smart specified there are going to be three subcomponent suppliers that are going to supply parts for this seat. The first one is Hammerstein. And so Hammerstein was the person responsible or company responsible for the design of the seat and the seat's mechanism components and the seat structure. Now, there was a sister company called LRA Unformatech, which is a sister company that supplied the metal structure to the seat. So you get these two companies, this one and this one. They've been told. They've been hired. They're going to supply these pieces, the metal parts to the seat. Remember, the metal parts allegedly failed. They're going to supply these to Magna Germany in Germany. And Magna Germany will now assemble the seat and put on the plastic pieces, the foam and the trim. And what will be done and left is a full seat, which we put on a truck or a train, and it goes off to the Smart plant in France. And that's all Magna Germany knows about that seat. They know that seat has been put out to the plant in Germany. And at that point, Smart takes the seats, puts them into the Smart for Two vehicles, and uses Daimler's district. What about what they claim is the certification that the seat is in compliance with U.S. regulations? There was a thoracic seat belt bracket that was on the seat, and that was a requirement by Smart for the U.S. market. Now, whether or not that would actually be used in a seat that was in a Smart for Two and is sold in the U.S. market, no one knows. That was up to Daimler. Now, those seats were sold in South America, North America, Australia, Europe, Asia, South Africa. Daimler made those decisions. They directed where those seats went. Some could have that bracket on it. Some could not. From Magna Germany's perspective, they didn't know. They didn't control that. The sense, I think, that your friend on the other side at least gave me, and maybe that's not what he's saying, is that by the certification of the bracket alone, seats that had this certification on it were the only ones that would be used in vehicles sold in the United States. Maybe they would be used in vehicles sold elsewhere, too. What part of that, if any, do you agree with? Were these, no seat would be sold, would be placed in a car that would be sold in the United States unless it had that bracket in it? Correct. So for the United States, Daimler specified you needed to have that thoracic seat belt bracket on the seat to be sold in North America. Now, whether or not you could sell that seat in South America, you could sell it in Europe, you could sell it in Asia, again, that is up to Daimler. Now, the compliance with Federal Motor Vehicle Safety Standards is not- So what you're saying is that that certification on a particular seat was no guarantee that that seat would be sold in the United States? That's right. That's very true. But if you're certifying it in compliance with U.S. regulations, there is some expectation that it could be sold in the United States. That's correct. That is a broad expectation because that's all of the United States, that's not Texas in particular, and that's part of what the problem was that the lower court noted. This is a form by form analysis. So even in Ainsworth, when we're looking at Mississippi and we're looking at the poultry industry in Mississippi and we've got a forklift that's made for moving poultry around, it's very form specific. So compliance with Federal Motor Vehicle Safety Standards is not a form specific contact. It applies to any state. So that means putting it into the stream of commerce and just wherever it ends up. But because it applies to any state, Magna can't be sued in any state? Under the specific jurisdictional analysis and given the contacts in this case, that's true. Now, it's a very fact specific analysis. So if the seat manufacturer was Lear Seats and let's say that Lear had a plant in Arkansas, that would be a completely different set of facts and circumstances. So given the highly fact specific analysis that we have to apply, being a form by form contact, then we look at the contacts here. You can envision a set of facts under which, given your premise, your client could be subject to a suit in a particular state? Not under these facts in this record, not as to Magna, Germany. A company that was in Germany, had no contact with Texas, didn't control the distribution of this seat to Texas. That was all Daimler. But what I hear you saying is you couldn't be sued in any state. Under these facts, that's true, Your Honor. And that doesn't mean the plaintiff is not without a remedy. So you've got in your head some set of facts where you could be sued. I don't want you to speculate about how your client could be sued, but in your mind there's some set of facts under which your client could be sued, Magna could be sued, in the United States. I was indicating there's a set of facts that a subcomponent supplier who's located in the United States could be sued under specific jurisdiction, not Magna, Germany, under these facts. Again, this is a German company that's supplying a seat to a German automobile manufacturer who has subsequently made decisions that they are going to export that seat to several markets, including North and South America. So again— Well, it seems to me part of your argument is factual. It is very much fact-based, and Ainsworth is very much focused on real numbers that we may not have in this case. But it seems to me you're relying a fair amount on the fact that there's no way for your client to know or anticipate what market, even American market, United States market, that these cars would go to that the seats were placed in. Are there any numbers in the record as to the relative size of Texas or United States to the marketing, regardless of sales, to the marketing of these vehicles versus South America or any other market that you said the cars went to? No, Your Honor. If you check the record sites, what you'll find specific to this vehicle is just some anticipated numbers, some targets that were set by Daimler, and that's all you're going to see. You're even going to see, as far as dealerships, some anticipated openings of dealerships in Texas. But as far as hard numbers, that's one of the distinguishing facts in this case. You just don't have that. Let's say the market was only the United States. There was no other place these assemblies in France the final vehicle was sent to. It was all sent to the United States. Does that change your position? Does the relative size of the Texas market? What I'm trying to get to is what causes this, in your argument, to collapse? And it seems to me what you're focusing on right now is that the plaintiff's case collapses because there's no way for your client even to know that these seats were going to be put in vehicles for the United States, much less one of the largest states in the United States. It may not have gone there at all. So if the only market was the United States, how does that affect your analysis? If the only market is the United States, the argument still holds because it's a form-by-form analysis. And if we go back to Volkswagen, and I think this is the key, it says the foreseeability that's critical due process is not the mere likelihood the product will find its way to the forum, but rather it's the defendant's conduct and connection with the forum. And the court goes on to talk about the expectation that it will be purchased by consumers in the forum, not the United States in the forum. The forum here is Texas, and the key here is the expectation. And Judge Southwick, I think that's exactly the nub is you're expecting it to be sold in Texas, and there's nothing in the record whatsoever that would support that conclusion based upon these facts and circumstances. Because, again, Magna had dropped this off at the plant in France, and that was it. If, in fact, the seat was defective and the cause of the death in this case, it would be Daimler's prerogative to seek indemnification in Germany? Is that how you envision this? Yes, Your Honor, that's it, yes. So here in this situation, we've got to keep in mind that there was eight defendants that were sued in Texas. There was eight. The plaintiffs settled with five, including Daimler and everyone in its distribution chain, and also with Hammerstein's company that purchased Hammerstein, which is Johnson Controls. So, yes, there was a satisfaction. Yes, it was taken advantage of. What remains, if anything, would be something that would be asked between Magna Germany and Daimler, which was a transaction that took place entirely in Europe. So if we were looking at that third prong, that's how that should come out, under the third prong. Are you arguing also that we should give deference to the Texas Supreme Court's interpretation of federal due process, or are you relying primarily on Fifth Circuit and U.S. Supreme Court jurisprudence? We're primarily relying upon Fifth Circuit jurisprudence. That's the other argument that we have. I'm going to let you finish, but what's your best Fifth Circuit case with regard to the holding in this case? Best Fifth Circuit case would be the Siefert v. Helicopteris case. And this one, there's a footnote inside that case, footnote number three, in which the court addresses beam dredging, which was an 84 case. A lot's happened since 1984, and it addresses some of the other cases that have been cited by Zok. And the key here that you'll note in that footnote is the terminology expect. In those cases, this court in Siefert said in those other cases, in the beam dredging, the love and care case, they were all situations where the defendant, under those facts, could expect that that product would be sold or used in the forum state, be that Louisiana or Mississippi or one of those states. The argument on the reach of the Texas long-arm statute is a problematic one. So consider this. This case was filed in Grayson County, Texas, the court of general jurisdiction in Texas. It was dismissed by the plaintiff. It was refiled in federal court. Now, we know in Texas that Texas follows the stream of commerce plus test for determining whether or not a company is doing business in Texas. So the long-arm statutes, it's in section 17 of the Civil Practice and Remedies Code. It defines the reach of the long-arm statute in Texas, and that includes a corporation doing business in Texas.  Well, the Texas Supreme Court has defined that in terms of the stream of commerce plus test. So mere foreseeability that a product was going to arrive in the market in Texas is not enough. There has to be additional conduct, which would be designing, advertising, marketing, sending your agents, again, making this a really clear case. And the problem here is if you apply the rules differently, then you get a problem with the Erie Doctrine because we get completely different outcomes in state court and in federal court. Under the situation here, there is no doubt whatsoever if this case stayed in Grayson County, we are not here having this argument now because that additional conduct does not exist at all. So this actually flows into the third point. How would it ever be fair and reasonable to exercise jurisdiction in this particular case when you would have a difference in outcome if you had applied those two different tests? It would be completely different in state court in Texas as it would be in the Fifth Circuit. How would that ever be fair and reasonable? Now, the criteria under that third set of factors is there's . . . We look at the burden on the defendant, and the only evidence in this record, of course, is from MAGNA on that particular point. And we also look at whether or not the form state has an interest in adjudicating the dispute. Applying the Texas test, they don't have any interest in adjudicating this test whatsoever. If we look at these plaintiff's interest and the interstate judicial system's interest in resolving these issues, we've got a good mix already because we've had eight defendants sued. We've had settlements with five of them. Two of them have been dismissed, and MAGNA Germany is the only one that remains. And under this situation, resolving that where the transaction took place in Europe makes the most sense. So would it be fair and reasonable? MAGNA Germany would say the answer here is no. It would not be fair and reasonable under these facts and circumstances to exercise jurisdiction over a seating company in Germany that has no connection with Texas. And that's what makes this case really unique under the facts. So many of the personal jurisdiction cases, the manufacturer controls the distribution. They're a part of it because they control that. They expect the product to end up in the form, and we just don't have that here because the distribution is Daimler's distribution chain. Daimler controlled how the product ended up in Texas. So we don't have that fact. That's just not present here. And the other thing that's not present is this numbers. How many of the seats are in Texas? On this record, we only really know two, and that was the ones that were in Zock's car. As far as the regular anticipated flow, we just don't have that in this record, so that makes this also unique. We have anticipated flows to the United States, but that gets us back to this whole problem of there's jurisdiction in any one of the 50 states so long as it goes into the stream of commerce, and that's what the New Jersey Supreme Court had in the Jay McIntyre case, and that's a test that even Justice Breyer rejected as being too broad because it gets us away from the form-by-form analysis, and it gets us back into this wherever you find your product, you can be sued. So that product becomes your agent for service of process just like it was someone working for you, and wherever they are found, you can be sued, and that was rejected in a Volkswagen, and it was rejected by Justice Breyer and his concurrence in Jay McIntyre. Is there a case law that you've addressed or can discuss here that gets back to what I was discussing with your friend on the other side? If the vehicle leaves the stream of commerce by being purchased by one individual and then is sold to the trade-in, as I understand, and then got sold again back in Texas, how does that affect even the applicability of this analysis? Well, the stream of commerce was supposed to be a metaphor. It was supposed to be helpful to explaining specific jurisdiction and when it could be exercised, and it's turned out to be anything but that. And so your example explains that. But if we even back it up further, so the stream for this seat was what? It was with Hammerstein. Hammerstein sends the metal with the sister ship down to Magna, Germany. They put it in the seat. The seat goes off to the plant in France, gets put in a car in France. Well, essentially that ends one stream. Another stream of the final product begins in France, and that one goes through Jacksonville, Florida, some across the southern United States, ends in Houston. It gets purchased by a Louisiana resident in Houston. He drives it over to Louisiana, registers and keeps it there, and eventually he resells it on the used car market. It gets sold to a Toyota dealership and then purchased by Mr. Zock. Right. The stream is a very crooked one, to say the least. But there's at least two streams, and that first one ended in France. Magna, Germany would ask that the lower court's decision be affirmed. Thank you, Counsel. Your Honors, the record is crystal clear that this seat was labeled, distributed, and built for the United States. Their own corporate representative, the Applebee's corporate representative, in the record at page 6747, page 6749, page 6751, and page 6755, were not acknowledged as much. So did the Daimler corporate representative at page 6785 in the record, 7418, and 6774. But does it deal with the distinction that was just made between making it compliant with American guidelines and actual knowledge that that seat would be sold in the United States as opposed to someplace else that would accept those same standards? Your Honor, the record cites that I just gave the court. If you go look at them, it was clear this seat was labeled for a U.S.-bound vehicle, not Brazil or South America or Asia, but for the United States of America. But would you disagree with the characterization? I may be misstating it, but what I heard, that it wasn't stamped or otherwise coded for sale in the United States. It was coded as being compliant with American standards. I would directly disagree, and I believe the record would disagree. Thank you. Your Honor, in addition, one of the other issues is that what counsel is arguing for, if accepted by this court, would absolutely send a thunderbolt through the automotive industry. If you bid to supply a safety component for a vehicle in the United States, it is part and parcel with doing so that you face judicial action in the United States, whether it be through regulatory action or through consumer claims if your product has a defect. If this court adopts the reasoning advocated by the appellee, Takata airbags could not be sued in the United States, nor could the appellee or any other similar component supplier, because the economic reality that's evident in the record by the agreements in place in this case is that no one is ever going to say we're supplying airbags for Louisiana or we're supplying seats for Michigan. That is not this market. The United States regulatory scheme is a nationwide scheme, and so is the marketplace. So if this court reverses 40 years of rulings and finds that you have to show targeting of Texas, that will never happen in the automotive component context, and defective components can be targeted for sale for profit in the United States at high volumes, as we had here, and yet face legal responsibility in none. Counsel, it seems to me that the sky isn't falling quite that much. As I understand the argument, it is that we don't have the evidence in this record that would be consistent with Ainsworth and other cases that shows reasonable expectation, knowledge on the part of that manufacturer of a component part of how much would be sold in Texas versus other locations. Your Honor, you have more evidence in this record than the court acknowledged in Ainsworth or Bean Dredging or the Scripto pen case. The record that was acknowledged in Ainsworth were very specific numbers of how many of these equipment was sold in Mississippi versus nationwide. Do you have numbers like that here? Your Honor, what we have here and we've supplied in the record is that Texas is the second largest market, that it had the second most dealerships, and that it has the second most registered drivers in the entire United States. So when you're targeting for sale 140,000 of these seats, it's certainly in the record, and I would remind the court that the standard here is to accept any ambiguity in the facts in the record in a light most favorable to jurisdiction. And if you consider those facts in a light most favorable to jurisdiction, there's no question that they could reasonably foresee that their product would be relied upon to perform safely in Texas, and should it not, that they could face legal action there. Do you have evidence in the record that MAGNA was aware? The information you're providing is the Daimler information, right, that Daimler is distributing vehicles. MAGNA has to be aware of that. Your Honor, in the record... Are you saying they could just bootstrap that knowledge to a supplier? Absolutely not. There is a contract in the record at page 660 through 6741, 130-page contract that makes numerous references signed by the appellee that you are going to design this seat to go to the United States in high volumes. The 139,000 number... I'm talking about specifically the connections to Texas and the two dealerships there. I'll 100% be candid, Your Honor. If this court requires that I have proof that the appellee targeted Texas directly, I will not have that evidence, nor will anyone else in any automotive component case. But that's not what the case law requires. I see my time has expired. We would ask the court to reverse the trial form. Thank you. Thank you. Appreciate the assistance from both parties. We'll take a brief recess before we hear the third case.